UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| G.K. LAS VEGAS LIMITED PARTNERSHIP and SHELDON GORDON, | ) ) ) | CV-S-04-1199 DAE-GWF |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SIMON PROPERTY GROUP, INC., et al., | ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

ORDER: (1) DENYING WITHOUT PREJUDICE DEFENDANTS' MOTION
FOR (A) DISMISSAL OF CLAIMS, OR IN THE ALTERNATIVE, AN
ADVERSE INFERENCE INSTRUCTION; AND (B) MONETARY
SANCTIONS, BASED ON PLAINTIFFS' SPOLIATION OF EVIDENCE;
(2) DENYING WITHOUT PREJUDICE PLAINTIFFS' CROSS-MOTION FOR
DIRECTED JUDGMENT OR, IN THE ALTERNATIVE, AN ADVERSE
INFERENCE INSTRUCTION; AND MONETARY SANCTIONS; AND
(3) DENYING AS MOOT DEFENDANTS' MOTION TO STRIKE

On February 23, 2009, the Court heard Defendants' Motion for (A)

Dismissal of Claims, or in the Alternative, an Adverse Inference Instruction; and

(B) Monetary Sanctions, Based on Plaintiffs' Spoliation of Evidence and Plaintiffs'

Cross-Motion for Directed Judgment, or in the Alternative, an Adverse Inference

Instruction and Monetary Sanctions.  George M Garvey, Esq., James C. Rutten,

Esq., C. Keith Rooker, Esq., and Michael D. Rawlins, Esq., appeared at the hearing

on behalf of Defendants.  Richard J. Pocker, Esq., appeared at the hearing on behalf of Plaintiffs.  After reviewing the motions and the supporting and opposing memoranda, the Court DENIES WITHOUT PREJUDICE Defendants' Motion, DENIES WITHOUT PREJUDICE Plaintiffs' Motion, and DENIES AS MOOT Defendants' Motion to Strike.

<u>BACKGROUND</u>

The parties are familiar with the facts of this case so the Court only recounts those pertinent to its immediate determination.  This action stems from a partnership formed between G.K. Las Vegas's managing partner, Gordon Group Holdings, Ltd. ("Gordon"), and Simon Property Group ("Simon").  On February 6, 1990, the parties created The Forum Developers Limited Partnership ("FDLP") to develop and manage the Forum Shops, a Las Vegas Strip shopping complex adjacent to Caesars Palace.  The FDLP partnership agreement (the "Agreement") included a buy-sell provision, under which the parties had the right to tender an all-cash price to purchase or, in the alternative, sell their pro rata interest in FDLP.

In 1998, Gordon desired to invoke the buy-sell provision of the Agreement and sought financial backing from Starwood Capital Group LLC ("Starwood").  Gordon and Starwood entered into an agreement under which Gordon would have to pay Starwood a "break-up" fee if Gordon were unable to

trigger the buy-sell.  According to Gordon, Simon violated the provisions of the Agreement by not letting Starwood conduct an audit of FDLP books, thereby causing Starwood to back out of the deal and Gordon to pay the break-up fee of $2.5 million.

In 1999, Hanna Struever, Gordon Vice President of Leasing, left the Gordon organization.  Sometime after her departure, her email files were "expunged."  Gordon now contends the organization expunges the electronic files of all former employees upon their departure from the company.

At some point in 2001, Gordon decided to switch to a new network server to house all of their electronic data.  The network server that had been in use up to 2001 (the "2001 Server") was removed and all files were transferred onto the new server (the "New Server").

In September 2001, Randall Brant, partner and President of the Gordon organization since the mid-1990s, left the company.  Brant had been heavily involved in, among other things, the proposed joint venture between Gordon and Starwood.  Brant executed the agreement between Gordon and Starwood under which Gordon was later forced to pay Starwood the $2.5 million break-up fee.  As with Struever, sometime after Brant's departure from the Gordon organization, his email files were expunged.

3

In 2002, Gordon again sought to sell its interest in FDLP.  Defendants rejected the attempted sale.  Early in 2003, Gordon decided to trigger the buy-sell provision of the FDLP agreement and offered to sell its interest in FDLP for $173,966,650, or to buy Defendants' interest for $240,733,350, resulting in an effective valuation of the entire partnership at around $590,000,000.  Defendants elected to purchase Plaintiffs' interest for $173,966,650.  On March 14, 2003, the buy-sell transaction was completed.

In August 2003, several months after the buy-sell transaction closed, Gordon had its IT vendor, Computronix, Inc. ("Computronix"), "clean" all the data off of the laptop computer of Scott Gordon.  Scott Gordon served as President of Gordon from 2001 to Fall 2007 and had been involved in, among other things, the buy-sell transaction of FDLP.  Specifically, he provided information to Gordon's financial partner, Taubman Centers, Inc., and their investment bank, Goldman Sachs & Co., concerning how to set the price of the buy-sell demand. Computronix cleaned off the files of Scott Gordon's laptop computer in order to enable another Gordon employee to use it for work.

A few months later on October 31, 2003, an article appeared in the Wall Street Journal in which Simon announced that the Forum Shops had been valued at $1 billion, significantly more than the valuation used in the buy-sell

4

transaction earlier that same year.  A few weeks later, Simon obtained a mortgage based on the $1 billion valuation.

In light of these events, Sheldon Gordon began consulting in November 2003 with a lawyer to determine his legal rights concerning the valuation of FDLP in the buy-sell transaction.  In May 2004, he retained present counsel and on August 27, 2004, Gordon filed its Complaint, alleging various causes of action under the Nevada racketeering statute, breaches of fiduciary duty, violations of securities laws, breaches of contract, and other equitable claims.

At some point in 2006, during the pendency of the instant litigation, Gordon discarded the 2001 Server, which had been in storage and unused since its removal in 2001.  Computronix "wrote zeros" to the 2001 Server drives, thereby erasing all data from them, and threw them out, along with several desktop computers that had been in use through 2005.

On December 11, 2007, this Court granted Plaintiffs' motion to amend the complaint and allowed Gordon to add two new causes of action, add the remedy of disgorgement, and add a plaintiff.  On January 10, 2008, Gordon filed a Third Amended Complaint ("TAC") additionally alleging, among other things, that Simon leveraged leases in the Forum Shops for the benefit of other properties in which Simon held an interest.

On December 30, 2008, the Court issued an order granting in part and denying in part Defendants' motions for summary judgment, dismissing Claims 4-7, 9-11[1], 14, 15, 17, 19, and 20 of the TAC.  The claims remaining are: Claim 12 for breach of contract based on Simon's alleged violations of the FDLP Agreement related to the Starwood deal and unpaid partnership distributions from November 2002 to January 13, 2003; Claim 16 for accounting; and Claim 21 for rescission of the buy-sell transaction for alleged misrepresentations or omissions made by Simon.

On December 1, 2008, Defendants filed the instant Motion for (A) Dismissal of Claims, or in the Alternative, an Adverse Inference Instruction; and (B) Monetary Sanctions, Based on Plaintiffs' Spoliation of Evidence.  (Doc. # 399.)  Plaintiffs filed a response on January 30, 2009, which included a cross-motion for a directed judgment or, in the alternative, an adverse inference instruction, and monetary sanctions.  (Doc. # 424.)  On February 17, 2009, Defendants filed a reply to Plaintiffs' opposition papers and an opposition to Plaintiffs' cross-motion.  (Doc. ## 429, 431.)  Plaintiffs then filed a reply in support of their cross-motion on February 19, 2009.  (Doc. # 432.)

---

[1]There is currently pending before this Court a motion for reconsideration on the Court's order dismissing Plaintiffs' disgorgement claim.

On February 20, 2009, Defendants filed a Motion to Strike Plaintiffs' Reply in Support of Cross-Motion as an Improper Sur-Reply.  (Doc. # 433.) Plaintiffs responded and opposed the motion to strike on February 20, 2009.  (Doc. # 434.)

## STANDARD OF REVIEW

A district court can sanction a party who has despoiled evidence under "the inherent power of federal courts to levy sanctions in response to abusive litigation practices."  Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006).

## DISCUSSION

The instant motion arises out of the deletion of email files of former Gordon employees, Brant and Struever, "cleaning off" data from former Gordon President Scott Gordon's computer, and disposal of the 2001 Server and several desktop computers.  Simon argues that as a result of these actions, Gordon failed to produce any emails from either Brant or Struever, and produced only 4 emails directly from Scott Gordon's computer.  Simon brings the instant motion seeking dismissal of the remaining claims or, in the alternative an adverse inference jury instruction, and monetary sanctions for attorneys fees and costs.

7

Gordon opposes the motion on several grounds.  First, Gordon claims that Simon's spoliation motion is grievously untimely, as Simon had notice of several of the events of which it complains between 4 and 20 months prior to filing and because it was filed after the close of discovery and after the deadline for dispositive motions.  Second, Gordon contends it was under no duty to preserve documents until at the earliest October 2003, when Sheldon Gordon first considered bringing claims based on the buy-sell transaction, and after Brant, Struever, and Scott Gordon's emails were purged.  Third, Gordon argues Simon has failed to demonstrate that any spoliation occurred or that any missing emails are relevant to the claims currently going to trial.  Finally, Gordon moves in a cross-motion that, should this Court consider Gordon's actions to be spoliation, the Court hold Simon to the same standard and find Simon liable for its own spoliation of evidence.

I.    Timeliness of Motion

Gordon first argues Simon's motion is untimely because, as a discovery motion, it was not raised "in close proximity to discovery deadline." (Opp'n at 5.)  Fact discovery in this case concluded on May 1, 2008.[2]  The instant

_____

[2] Although the Court issued an order on November 25, 2008 granting Simon additional limited discovery, the issues implicated by this discovery are unrelated to the instant motion.

8

motion was not filed until December 1, 2008.  To support its argument, Gordon

cites to Gault v. Nabisco Biscuit Co., 184 F.R.D. 620 (D. Nev. 1999), in which the

court found a motion to compel untimely because it was not filed during a time

close to the end date for discovery.

        Gault, however, is inapposite because the instant motion is a motion

for sanctions, not a discovery motion such a motion to compel.  As such, Gault

does not provide sufficient guidance on the timeliness of this motion.

        Gordon also argues Simon's motion is untimely because, as a motion

seeking dismissal of the claims, it must have been filed before the deadline for

dispositive motions.  In this case, dispositive motions were to be filed by

September 15, 2008, two and a half months prior to Simon's filing of the instant

motion.

        Simon's spoliation motion, although seeking dismissal, should not be

viewed for timeliness purposes as a dispositive motion.  A spoliation motion is not

dispositive in the classic sense of a motion to dismiss under Federal Rule of Civil

Procedure 12 or a motion for summary judgment under Federal Rule of Civil

Procedure 56.  Instead, it is more akin to a sanctions motion under Federal Rule of

Civil Procedure 37 ("Rule 37"), in which parties may be sanctioned for failure to

abide by a discovery order from a court.  Although Gordon is not specifically

9

moving under Rule 37 because the alleged spoliation here is not in direct violation of a specific order of the Court, the principles underlying Rule 37 are instructive. Rule 37 has no time limit for when sanctions motions must be made or when the Court may make such determinations. As such, the instant motion must be seen more as a sanctions motions seeking the ultimate sanction of dismissal, rather than a substantive dispositive motion dealing with the legal or factual merits of either party's case, and therefore no specific deadline is required.

Finally, Gordon argues that Simon's motion cannot be made after this Court has already entered partial summary judgment. In <u>Morse Diesel International, Inc. v. United States</u>, 81 Fed. Cl. 220, 222 (Fed. Cl. 2008), the Court of Federal Claims found a motion based on spoliation untimely because it was filed after the court had ruled on a motion for partial summary judgment. The <u>Morse Diesel</u> court's prior ruling granted summary judgment on liability and damages, thereby essentially ending the substance of the case. In other words, after the court's decision on partial summary judgment, no real case was left.

On October 6, 2008, this Court entered partial summary judgment against Gordon, dismissing selected claims. Unlike <u>Morse Diesel</u>, the October 6, 2008 order did not have a sweeping effect on the survival of the case. Rather,

many of Gordon's claims survived the Court's ruling.  Indeed, several causes of action remain today.  As such, Gordon's citation to <u>Morse Diesel</u> is unpersuasive.

In contrast to Gordon's assertions, the instant motion is timely filed. Simon's motion for sanctions based on spoliation falls under this Court's "inherent power." <u>Leon</u>, 464 F.3d at 958.  As such, a strict timeliness requirement is not mandated nor would it support the general principles of justice and fairness underlying the Court's discretion.  Accordingly, this Court will consider the motion on its merits.

## II.   <u>Spoliation</u>

Spoliation occurs where the subject evidence is wholly unavailable, materially altered, mutilated or destroyed.  <u>See</u> Black's Law Dictionary 1437 (8th ed. 2004); <u>Silvestri v. Gen. Motors Corp.</u>, 271 F.3d 583, 590-93 (4th Cir. 2001). Spoliation requires that records be "destroyed with a culpable state of mind," although the degree of culpability may vary.  <u>In re Napster, Inc. Copyright Litigation</u>, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006).  A party engages in willful spoliation of evidence when he "had some notice that the evidence was potentially relevant" to the litigation before it was destroyed.  <u>United States v. $40,955.00 in U.S. Currency</u>, --- F.3d ---, 2009 WL 174911, at *5 (9th Cir. Jan. 27, 2009).  In the absence of willful destruction of evidence, spoliation may also

include actions which are "negligent and possibly reckless." Zubulake v. UBS
Warburg LLC, 220 F.R.D. 212, 221 (S.D.N.Y. 2003).  In order to show this lesser
form of spoliation, the movant must "demonstrate that a reasonable trier of fact
could find that the missing e-mails would support [their] claims."  Id.

       "A party does not engage in spoliation when, without notice of the
evidence's potential relevance, it destroys the evidence according to its policy or in
the normal course of its business." $40,955.000, 2009 WL 174911 at *5 (citing
United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001-02 (9th Cir. 2002).

       Spoliation also does not occur absent a duty to preserve the evidence
or documents.  "The duty to preserve documents attaches 'when a party should
have known that the evidence may be relevant to future litigation.'"  In re Napster,
462 F. Supp. 2d at 1068 (quoting Zubulake, 220 F.R.D. at 216).  The future
litigation must be "probable," which has been held to mean "more than a
possibility."  Id. (quoting Hynix Semiconductor Inc. v. Rambus, Inc., 2006 WL
565893 at *21 (N.D. Cal. 2006)).

       Simon contends that Gordon was under a duty to preserve documents
relating to the Simon-Gordon relationship as far back as 1998.  Gordon, on the
other hand, argues that at the earliest, it could only be held to a duty as of October
2003, after Brant, Struever, and Scott Gordon's emails had already been deleted.

This Court notes at the outset that in some instances actual destruction of documents may not have occurred.  According to Elliot Lehman, a representative of Computronix, Gordon's email system was configured so that "[t]he message is always on the server in every case" even if "the user was using e-mail remotely."  (Mot. Ex. 78 at 90-92.)  While the laptop computer itself may not always make a "synchronized copy of the data" when accessing the system remotely, the message is always saved on the network server.  (Id.)  Of course, if an employee were working on the local network at the same physical location as the server (i.e. in the Gordon office), the email message would likewise be saved on the network server.  (Id.)

In this case, there are several events which deleted or expunged emails from various systems.  In that sense, emails were "destroyed."  However, it is important to distinguish between the various events in order to assess whether emails were "destroyed" or permanently erased so that they are unavailable to the parties at this time.

The "cleaning off" of Scott Gordon's laptop computer, for example, certainly deleted those files from the hard drive on the laptop itself.  As described above, however, all Gordon emails were saved to the network server in use at the time, regardless of whether the email was sent while Scott Gordon was on-site or

accessing the system remotely.  Therefore, any Scott Gordon emails sent during the use of the 2001 Server should have been saved to the 2001 Server and those emails should have been "cut and paste" over to the New Server in 2001.  (See Mot. Ex. 78 at 129-31) (data was "[p]hysically cut and paste onto the new server . . . This is literally removing it from one and putting it on the other.")  According to Computronix, tests verified that the data from the 2001 Server had been successfully transferred to the New Server.  (Id. at 130-31.)  As such, the New Server should currently possess all emails that had been saved to the 2001 Server.

Similarly, the New Server should have copies of all Gordon emails sent and received since 2001.  Accordingly, the New Server should have copies of all Scott Gordon emails from the inception of the 2001 Server until the present day.  The "cleaning off" of Scott Gordon's laptop, therefore, should have no impact on the ability of Gordon to produce Scott Gordon emails during the relevant periods and should not constitute spoliation as no evidence or documents were actually permanently destroyed.

The problem, however, is that Gordon only produced 4 emails from Scott Gordon directly.  While Gordon spends considerable time emphasizing that Scott Gordon emails were produced from other sources, this does not obviate their

14

responsibility to produce the emails from Scott Gordon himself, either from his personal laptop computer or from the Gordon server.  Such minuscule production, especially in light of Scott Gordon's heavy use of email, defies explanation.

At the hearing on the instant motion, the Court asked Gordon's counsel repeatedly why so few emails were produced due to the fact that the New Server should have copies of them.  Counsel for Gordon stated that his client had run the stipulated searches of the New Server and had produced the emails it had found.  No explanation was given as to why emails produced by other sources did not come up in these searches of the New Server.  The Court suggested to counsel for Simon that it pursue forensic analysis of the New Server in order to determine whether the New Server does, in fact, possess the emails and data that it should.

As such, the Court finds that at this juncture Simon cannot demonstrate that Scott Gordon's emails were, in fact, destroyed.  Simon cannot therefore demonstrate spoliation.  If, after further discovery is conducted and/or trial testimony uncovers grounds to believe data and emails were destroyed, the Court would be willing to entertain another motion based on spoliation. Accordingly, this Court DENIES WITHOUT PREJUDICE Simon's motion with respect to spoliation of Scott Gordon emails.

In the same vein, Simon cannot show at this juncture that Gordon's "writing zeros" to and throwing out the 2001 Server constituted spoliation.  If Simon can show at a later time that the actions taken with respect to the 2001 Server resulted in destruction of evidence, data, or emails, the Court would entertain another motion based on spoliation of the 2001 Server.  Accordingly, this Court DENIES WITHOUT PREJUDICE Simon's motion with respect to spoliation of data on the 2001 Server.

Finally, in regards to the "expunging" of Struever and Brant's emails, the only evidence presented to this Court of the destruction of these email files was a letter sent during discovery stating that "GKLV does not have access to the e-mail files of former employees, including Randall Brant and Hannah Streuver [sic] because GGH expunges the electronic files of all former employees upon their departure from the company."  (Mot. Ex. 9 at 2.)  Although there is considerable dispute over whether this is, in fact, the policy of Gordon (see Mot. at 13), it remains unclear whether the term "expunge" means deletion from both the hard drives and the server.  If the data was completely erased from both the hard drives and the 2001 Server, then there is no doubt actual destruction occurred.  At this point, however, the Court feels there is not sufficient evidence of what

"expunging" the emails means and therefore cannot proceed to an analysis of

Gordon's duty to preserve the email files of Struever and Brant.

In light of the Court's suggestion that Simon conduct forensic analysis

of the New Server to determine whether it contains -- either openly, dormant, or

otherwise -- copies of all Gordon emails, the Court feels it is prudent at this

juncture to refrain from making any findings with respect to actual destruction.

Accordingly, this Court DENIES WITHOUT PREJUDICE Simon's motion with

respect to the remaining issues of Struever and Brant's email files, therefore

denying without prejudice the entirety of its motion.

III.    Plaintiffs' Cross-Motion

Gordon filed a cross-motion in its opposition to Simon's motion.

(Doc. # 424.)  The cross-motion was conditioned, however, on the Court's findings

with respect to Simon's motion.  Specifically, Gordon's brief states:

> Whatever standard of timeliness, evidence preservation,
> and permitted inferences applies to one party must apply
> equally to both.  For this reason, and for this reason only,
> Gordon also makes a cross-motion for spoliation
> sanctions against Simon equivalent to those Simon is
> seeking.  Gordon asks the Court to consider this cross-
> motion only in the event that the Court excuses the
> untimeliness of Simon's motion and relaxes the
> substantive requirements for sanctions sufficiently to
> grant Simon any of the relief it requests.  If, however, the
> Court holds, as we believe appropriate, that none of

17

> Simon's "spoliation" claims are either timely or
> meritorious, Gordon requests no further consideration of
> its mirror-image allegations against Simon.

(Opp'n at 4-5) (emphasis in original).

The Court has found Simon's motion timely and likewise finds, under this Court's inherent power to hear motions for sanctions, Gordon's motion is timely as well.  The Court has refrained, however, from making further findings with respect to Simon's claims for spoliation.  Accordingly, the Court DENIES WITHOUT PREJUDICE Gordon's cross-motion.  The Court will entertain another cross-motion should Simon choose to pursue further sanctions at a later time.

IV.   <u>Defendants' Motion to Strike</u>

Simon filed a motion to strike Gordon's reply in support of its cross-motion as an improper sur-reply because, Simon argues, it contained significant arguments that were actually in opposition to the underlying Simon motion for sanctions.  (Mot. to Strike at 1.)  Because the Court is not considering the merits of Gordon's cross-motion, there is no need to assess whether Gordon's reply supported either its opposition or its cross-motion.  Accordingly, the Court DENIES AS MOOT Simon's motion to strike.

CONCLUSION

For the reasons stated above, the Court DENIES WITHOUT

PREJUDICE Defendants' Motion, DENIES WITHOUT PREJUDICE Plaintiffs'

Motion, and DENIES AS MOOT Defendants' Motion to Strike.  If, after forensic

examination of the New Server or upon further discovery or testimony, Simon

believes it can establish destruction of evidence, the Court will entertain future

motions for sanctions from both parties based on spoliation.

IT IS SO ORDERED.

DATED: Honolulu, Hawai`i, March 9, 2009.

_____
DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE


G.K. Las Vegas Limited Partnership vs. Simon Property Group, Inc., et al., CV-S-
04-1199 DAE-GWF; ORDER (1) DENYING WITHOUT PREJUDICE
DEFENDANTS' MOTION FOR (A) DISMISSAL OF CLAIMS, OR IN THE
ALTERNATIVE, AN ADVERSE INFERENCE INSTRUCTION; AND (B)
MONETARY SANCTIONS, BASED ON PLAINTIFFS' SPOLIATION OF
EVIDENCE; (2) DENYING WITHOUT PREJUDICE PLAINTIFFS' CROSS-
MOTION FOR DIRECTED JUDGMENT OR, IN THE ALTERNATIVE, AN
ADVERSE INFERENCE INSTRUCTION; AND MONETARY SANCTIONS;
AND (3) DENYING AS MOOT DEFENDANTS' MOTION TO STRIKE