**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

G.K. LAS VEGAS LIMITED PARTNERSHIP, *et al.*,

    Plaintiffs,

vs.

SIMON PROPERTY GROUP, INC., *et al.*,

    Defendants.

Case No. 2:04-cv-01199–DAE-GWF

**FINDINGS AND RECOMMENDATION**

**Motions Regarding Forensic Examinations**

This matter is before the Court on the following matters:

(1) Defendants' Second <u>Emergency</u> Motion to Enforce Orders Regarding Forensic Examinations and Related Relief (#451), filed on June 18, 2009;

(2) Plaintiffs' Response to Defendants' Second <u>Emergency</u> Motion to Enforce Orders Regarding Forensic Examinations and Related Relief and Plaintiffs' Counter-Motion to Vacate Court's May 14, 2009 Order, Modify Court's March 9, 2009 Order, and Related Relief (#452, #453), filed on June 23, 2009;

(3) Defendants' Reply Memorandum in Support of Second <u>Emergency</u> Motion to Enforce Orders Regarding Forensic Examinations and Related Relief and Defendants' Opposition to Plaintiffs' Counter-Motion to Vacate Court's May 14, 2009 Order, Modify Court's March 9, 2009 Order, and Related Relief (#456, #457), filed on June 26, 2009; and

(4) Plaintiffs' Reply in Support of Counter-Motion to Vacate Court's May 14, 2009 Order, Modify Court's March 9, 2009 Order, and Related Relief (#460), filed on June 30, 2009.

These motions arise out of previous motions that were heard and decided by District Judge David Ezra. Judge Ezra is currently presiding over a criminal jury trial in this district which is expected

1  to last several more weeks or months.  He therefore referred the foregoing motions to the undersigned
2  United States Magistrate Judge.  The Court conducted an initial status hearing regarding these motions
3  on July 2, 2009 and thereafter heard oral argument on July 31, 2009.

## BACKGROUND

5        On December 1, 2008, Defendants filed a Motion for (A) Dismissal of All Claims, or in the
6  Alternative, an Adverse Inference Instruction; and (B) Monetary Sanctions, Based on Plaintiffs'
7  Spoliation of Evidence (#399) (hereinafter "Spoliation Motion").  Defendants argued that Plaintiffs had,
8  at minimum, negligently destroyed or failed to preserve relevant email communications of three of its
9  principal officers who were involved in the transactions underlying the claims in this lawsuit.  In
10 particular, Defendants argued that Plaintiffs had only produced four emails of Scott Gordon who was
11 Plaintiffs' president from 2001 to Fall 2007.  Defendants argued that such minuscule production was
12 incredible because Scott Gordon was involved in the events underlying this lawsuit and was a frequent
13 user of email, and because Defendants had obtained other relevant Scott Gordon emails from other
14 sources.  The Spoliation Motion also concerned the destruction of emails of former Gordon officers and
15 employees, Hanna Struever and Randall Brant.  Ms. Struever and Mr. Brant left Plaintiffs' employment
16 in 1999 and 2001, respectively, and their email files were allegedly expunged from the computers
17 pursuant to company policy or procedure.

18       Judge Ezra conducted a hearing on Defendants' Spoliation Motion on February 23, 2009.
19 Information provided to the Court indicated that potentially relevant emails were erased from a laptop
20 computer Scott Gordon had used before that laptop computer was transferred to another of Plaintiffs'
21 employees in 2003.  Plaintiffs represented, however, that the emails and other data on Scott Gordon's
22 laptop would have been copied onto his new laptop computer prior to the erasure.  It was unclear at the
23 time of the hearing, however, what had become of Mr. Gordon's "new" laptop.  Mr. Gordon's laptops
24 were also connected to a network and the emails would have automatically been downloaded into
25 Plaintiffs' computer server(s).  One of the servers was reportedly replaced in 2001 and the data on that
26 server was transferred to a "New Server" at that time.  The electronic data on the old server was later
27 erased in 2006.  Although Plaintiffs represented to the Court that they conducted a search of the
28 computer servers in accordance with the search protocol agreed upon by the parties, only four emails of

1  Scott Gordon were discovered. Plaintiffs acknowledged, however, that they did not conduct a
2  "forensic" search of their computer hard drives to determine whether additional, relevant Scott Gordon
3  emails may be located therein.
4       Judge Ezra concluded that Defendants' Spoliation Motion could not be granted on the record
5  presented because of the possibility that Scott Gordon's and the other officers' emails may still be
6  located on one or more computer hard drives in Plaintiffs' possession, custody or control. Although
7  Judge Ezra suggested that a forensic inspection of Plaintiffs' computers would have been appropriate
8  under the circumstances, he initially indicated that he would not permit additional discovery or
9  authorize a forensic examination of Plaintiffs' computer hard drives because the Defendants had not
10 moved for such relief during the discovery period or within a reasonable time after its expiration.
11 *Motion (#451), Exhibit "A"*, 2/23/09 Hearing Transcript, pages 22-23. As the hearing progressed,
12 however, Judge Ezra expressed his concern and scepticism about Plaintiffs' inability to explain why it
13 was unable to produce relevant emails of Scott Gordon which still should be located on Plaintiffs'
14 server(s). These concerns, which led Judge Ezra to reverse his initial position and authorize a forensic
15 examination, are summarized in the Court's order (#437) filed on March 9, 2009 at page 15.
16      During the February 23, 2009 hearing, Judge Ezra also discussed the "new" laptop computer to
17 which Scott Gordon's emails had reportedly been transferred in 2003. Judge Ezra ordered Plaintiffs to
18 provide information regarding "what happened" to the 2003 laptop, where it was located, or the
19 location of other computers to which its data had been transferred so that those computers could be
20 forensically examined if Defendants desired such an examination. *Motion (#451), Exhibit "A"*, 2/23/09
21 Hearing Transcript, pages 46-47.
22      During the February 23, 2009 hearing, Judge Ezra repeatedly stated that a forensic examination
23 would have to be conducted by an independent forensic expert or group of experts. In initially
24 addressing Defendants' counsel about a forensic examination, Judge Ezra stated:
25 > I mean, now, that doesn't mean you would have access to all of the
26 > information on there; it would have to be produced to the Court in
27 > camera so that private information that had nothing to do with this
28 > wouldn't be turned over, so we would have to get an independent third-
> party expert to do that, and then they would produce the files not to you,
> but to the Court for in camera inspection . . .

1  *Motion (#451), Exhibit "A"*, 2/23/09 Hearing Transcript, pages 22-23.

2  Addressing Plaintiffs' counsel about the forensic inspection, the Court stated: "It would have to be independent and it would have to be for in-camera review because it would be wholly unfair to either side -- I wouldn't do it to the Simon Group either." *Id.*, at page 47.  Later, addressing Defendants' counsel, the Court stated: "Now, the next question is do you want to do a forensic search on that server by an independent expert to find out whether, in fact, there are retrievable emails on there for the relevant time periods sent to or from Mr. Gordon? ..." *Id.*, at page 53.  In discussing how the information could be retrieved from Plaintiffs' servers and hard drives, the Court stated: "Again, it would have to be by an independent group that was approved by both parties and the Court with a very strict order in place." *Id.*, at page 53.  Finally, in discussing the forensic examination, the Court advised Defendants' counsel:

> If you decide you want to do that, of course, you need to contact me first because we have to work out an order.  We have to get the people involved who are going to be in a position to do that.  We have to get a timeframe.  Your client will bear the cost of that at this time.  If it turns out that it can be later determined at trial or thereafter that there was an intentional deletion; in other words, it was some sort beyond negligence now, but an intentional deletion, the Court might shift the burden of those expenses to the other side.

*Id.*, at pages 55-56.

The parties agreed on April 14, 2009 that FTI Consulting would perform the forensic examination. *Motion (#451), Rutten Affidavit*, ¶ 7.  On April 24, 2009 Defendants filed an Emergency Motion to Enforce Orders Regarding Forensic Examinations (#443) in which they accused Plaintiffs of "foot-dragging" and "stonewalling" in providing information about the computers that Scott Gordon used or may have used and in refusing to agree to a stipulated order governing which computers would be subject to the forensic examination and the scope of that examination.  Defendants submitted with their motion a proposed order governing the forensic examination to be performed by FTI.  Defendants' Motion also stated:

> The proposed order ensures that the independent entity that will conduct the forensic examination is one that Plaintiffs have already approved for the purpose -- FTI Consulting, a nationally renowned expert in this area.

*Motion (#443)*, page 15.

4

1    Defendants' motion also asked that the Court order Plaintiffs to answer three questions
2 regarding "Scott Gordon's 2003 Laptop." *Id.*
3    In their Opposition (#446) filed on May 4, 2009, Plaintiffs denied the accusations of foot-
4 dragging and stonewalling.  Plaintiffs further stated that they agreed to the revised version of the
5 proposed order governing the forensic examination attached to Defendants' motion which had not been
6 submitted to them for approval prior to the filing of the motion.  Plaintiffs, however, opposed
7 Defendants request that they be required to answer Defendants' proposed questions regarding "Scott
8 Gordon's 2003 Laptop."
9    It appears that Defendants' counsel contacted FTI about the case and its willingness to perform
10 the forensic examination after Plaintiffs filed their opposition on May 4, 2009 in which they stated that
11 they had no objection to the proposed order governing the forensic examination.  The earliest email
12 between FTI and Defendants' counsel is dated May 6, 2009. *Motion (#451), Exhibit "O"*, page 6.  This
13 email appears to be a follow-up to a telephone call between Mike Pace of FTI and one of Defendants'
14 attorneys, George Garvey.  Mr. Pace states in his correspondence summary that "some time prior to
15 5/7," he spoke with Defendants' assistant general counsel Jack Boyd regarding FTI's forensic
16 capabilities and that he also received a call from attorney Garvey regarding FTI performing work
17 related to the Simon/Gordon litigation. *Defendants' Reply Brief (#456, #457), Exhibit "A"*.
18    According to Defendants, FTI began reviewing various pleadings on PACER to inform itself
19 about the case, the spoliation issue being litigated, and the technical issues that it might encounter.
20 *Motion (#451), Rutten Affidavit*, ¶¶ 7-8.  Mr. Rutten further states that FTI posed various questions to
21 him and others in his law firm and they supplied FTI with various documents that were not available on
22 PACER. *Id.,* ¶ 8.  Emails attached to Defendants' Motion show that on May 11, 2009 Defendants'
23 counsel provided FTI with copies of Plaintiffs' opposition to the Spoliation Motion and a transcript of
24 the February 23, 2009 hearing.  Defendants also provided FTI with the exhibits to Defendants'
25 Spoliation Motion and the transcripts of the Fed.R.Civ.Pro. 30(b)(6) depositions regarding Plaintiffs'
26 data/document retention. *Motion (#451), Exhibit "O"*, pages 16- 20.  Defendants' counsel did not
27 notify Plaintiffs' counsel that they had provided these documents to FTI.
28 . . .

5

On May 14, 2009, the Court entered order (#449) governing the forensic examination. The first sentence of that order states: "Pursuant to the Court's order dated March 9, 2009 and its orders in open court on February 23, 2009, and pursuant to the joint agreement of the parties hereto, the Court hereby enters the following additional order: . . ."

Paragraph (3) of the order charges FTI Consulting with performing two related, but distinct investigative tasks. The first task is to determine if the computer equipment described in paragraph (1) of the order contains sent or received e-mails for Scott Gordon, Randall Brant and Hanna Struever during the "Relevant Period," January 1, 1989 to September 30, 2003 and to restore any deleted emails for these individuals to the extent they can be restored. FTI is to then perform a search of the emails pursuant to the parties' previously agreed upon search protocol for relevant emails. Any potentially relevant emails discovered in this process shall first be provided by FTI to Plaintiffs' counsel for review and objection. The emails, together with Plaintiffs' privilege log, shall then be submitted to the Court for *in camera* review and entry of an order for production of relevant, non-privileged emails and documents. FTI's second investigative task is to determine "(d) whether e-mails from the Relevant Period that reside or formerly resided in each of the email boxes have been deleted, and if so, when they were deleted; how they were deleted ...; who deleted them; whether they were deleted piecemeal, en masse, or in some combination thereof; and whether any of the data can be restored; and (e) any information bearing on whether data from the Relevant Period was deleted under circumstances evincing any effort to destroy or to conceal evidence." *Order (#449)*, page 3.

On May 14, 2009, the Court also entered a separate order (#450) which denied Defendants' motion to require the Plaintiffs to answer questions about (1) the circumstances of Plaintiffs discarding Scott Gordon's 2003 laptop and when it was discarded; (2) whether Plaintiffs discarded other laptops that were owned or used by Scott Gordon for work purposes and, if so, when they were discarded; and (3) the approximate dates that Scott Gordon used any of the computers disclosed by Plaintiffs' counsel in a March 13, 2009 letter to Defendants' counsel. The Court stated that Defendants' proposed interrogatories seek "to establish a factual basis for a later claim of spoliation. As the discovery deadline has long passed in this case, such interrogatories are untimely and irrelevant to the issue presently before the Court (i.e. forensic examination of that equipment to which the parties presently

1   have access.)" *Order (#450)*, pages 2-3.  The Court did, however, require Plaintiffs to disclose the

2   locations of any computers that would be subject to the forensic examination.  *Id.*

3      On May 14, 2009 Defendants' counsel James Rutten emailed a copy of order (#449) to FTI's

4   representatives Mike Pace and Eric Matrejek.  Upon receipt of the order, Mr. Pace responded in part as

5   follows:

6        We expect to provide an engagement document by close of business tomorrow, or by Monday at the latest.  Our current thinking is to consider
7   having both sides (plaintiff and defendant), or counsel for both sides, sign the engagement document, in part because the order is entered pursuant to
8   the joint agreement by the parties, and requires us to submit a report to all parties.  We have not made a final determination and are pleased to
9   discuss tomorrow morning if you would like.

10   *Motion (#451), Exhibit "O"*, page 43.

11      Mr. Rutten sent an immediate email response stating: "Let's have Simon as the engaging party

12   since it's the only one paying the bills."  *Id.*

13      The first paragraph of FTI's Engagement Letter, which was executed by FTI and Defendants'

14   general counsel on or about May 21, 2009, states as follows:

15        This letter confirms your retention of FTI Consulting, Inc. ("FTI") as electronic discovery and litigation consultants in connection with the
16   above captioned matter, pursuant to that specific Order Regarding Forensic Examinations of Computer Equipment (the "Order") dated May
17   14, 2009  . . . .  The Order outlines the scope of FTI's services for purposes of the Engagement, and is attached and specifically incorporated
18   herein.

19   *Motion (#451), Exhibit "O"*, page 75.

20      Defendants' counsel made arrangements for FTI consultants Mike Pace, Eric Matrejek and Brett

21   Harrison to travel to Defendants' offices in Indianapolis, Indiana on May 19, 2009 to meet with

22   Defendants' litigation counsel, Mr. Rutten, and Defendants' assistant general counsel, Jack Boyd.

23   According to Mr. Rutten's affidavit, the  purpose of this meeting was for Defendants' counsel to

24   confirm that FTI's personnel were sufficiently knowledgeable and experienced to perform the forensic

25   search.  *Motion (#451)*, Affidavit of James Rutten, ¶ 9.  According to the brief "correspondence

26   summaries" of the meeting provided by Mr. Pace and Mr. Harrison, the meeting involved a discussion

27   of FTI's qualifications, who would perform the work, and logistics of travel and access to perform the

28   work.  *Defendants' Reply Memorandum (#456), Exhibit "A"*.  Mr. Matrejek has not provided a

summary of his recollection of this meeting. Defendants' counsel did not inform Plaintiffs' counsel that they were arranging such a meeting with the FTI consultants or invite Plaintiffs' counsel to attend. Nor did Defendants' counsel inform Plaintiffs' counsel that such a meeting had occurred until the dispute regarding FTI's independence arose.

Pursuant to the Court's May 14, 2009 Order (#450), Plaintiffs were required to inform Defendants on or before May 29, 2009 where the laptop Scott Gordon used in 2003 is currently located and to identify the locations of any subsequent laptops to which data from the 2003 laptop had been transferred. *Order (#450)*, page 3. On May 29, 2009, Plaintiffs' counsel Richard Pocker sent a letter to Defendants' counsel stating that the laptop Scott Gordon used up to August 2003 was last known to be in the possession of Peg Rehill, a former employee of the Gordon Group. Plaintiffs' counsel provided Defendants with Ms. Rehill's last known address. *Motion (#451), Exhibit "E"*.[1]

Mr. Pocker's May 29th letter further advised:

> 2. The laptop to which Scott Gordon's data was transferred in August 2003 may have incurred inadvertent water damage in January 2004. After a diligent search, Gordon has found no further information regarding the subsequent whereabouts of the computer or the fate of its data.

*Motion (#451), Exhibit "E"*.

Defendants' counsel sent a letter to Mr. Pocker on June 2, 2009 in which he asked a number of questions concerning the above statements. *Motion (#451), Exhibit "I"*. The questions included whether the laptop had, in fact, incurred water damage, the last known location of the laptop computer, where the computer was located when it was allegedly damaged, and to whom the laptop was "given, sold or transferred." Plaintiffs' counsel refused to respond to these additional inquiries on the grounds that they have fully complied with the Court's order (#450).

Defendants' counsel Mr. Rutten also forwarded Mr. Pocker's May 29, 2009 letter to Mike Pace of FTI Consulting on June 2, 2009 with the following request or suggestion:

---

[1] According to Mr. Rutten, he subsequently made telephone contact with Ms. Rehill who stated that she had given the computer to a family member. Ms. Rehill agreed to inquire whether the laptop still exists and to call Mr. Rutten back. She did not do so, however, and subsequent efforts to contact her were unsuccessful. *Motion (#451), Rutten Affidavit*, ¶ 12.

> One question you might want to pose while your at plaintiffs' offices [to obtain a forensic image of the server] is whether data from the "possibly water damaged" laptop was copied onto other computers used by Scott Gordon. I don't have Brett Harrison's email, so I would appreciate it if your could forward this to him.

*Motion (#451), Exhibit "O"*, page 93 (bracketed material added by the Court).

In a follow-up email, Mr. Rutten clarified that this question should only be posed to Tim Fitzgerald who is an "in-house" attorney for Plaintiffs and works in the office where the computer server to be imaged was located. *Id., Exhibit "O"*, page 92. According to Plaintiffs, FTI's consultant Brett Harrison entered Mr. Fitzgerald's office on June 3, 2009 and asked "for details regarding the 'water damaged' laptop." Mr. Fitzgerald asked Mr. Harrison how he knew about the water damaged laptop and Mr. Harrison responded that Simon's counsel had sent him an email about it the previous night. Mr. Fitzgerald allegedly asked Mr. Harrison about any other *ex parte* communications he may have had with Simon or its representatives and Mr. Harrison allegedly stated that there were none. Plaintiffs have not submitted an affidavit by Mr. Fitzgerald.

After FTI completed its imaging of Plaintiffs' computer server in Greenwich, Connecticut on June 3, 2009, FTI's consultant, Mr. Harrison, advised Mr. Rutten that once the image of the server was reviewed at FTI's facilities, it was determined that some of the server did not copy effectively because the server was not turned-off during the imaging. Mr. Harrison indicated that he needed to re-image certain portions of the server while it was shut down and offered to do so after business hours. *Motion (#451), Rutten Affidavit*, ¶ 16. Mr. Rutten sent an email to Plaintiffs' counsel regarding this matter and requested and proposed dates for the re-imaging. *Id.*, ¶ 17.

By this point, however, Plaintiffs' counsel were disturbed by what they perceived to be Defendants' counsel's disregard of FTI's role as an independent expert and the attempt to use FTI to obtain information about Scott Gordon's "water damaged laptop" that was allegedly outside the scope of FTI's assignment. Plaintiffs' counsel also advised that the need for re-imaging was contrary to the information that FTI had provided to Plaintiffs' representatives at the time imaging was performed. Plaintiffs' counsel stated that any such request should be made to Plaintiffs directly by FTI rather than being filtered through the Defendants' counsel. Plaintiffs' counsel was also unwilling to permit re-imaging of the shut down server after work hours because it would require Plaintiffs to have personnel

9

onsite who would not otherwise be in the office at that time. Plaintiffs' counsel also demanded that Defendants' counsel and FTI provide Plaintiffs with all communications between them. *Motion (#451), Exhibit "N"*, Plaintiffs' counsel's June 8, 2009 letter. Defendants subsequently produced a copy of their email and other written communications with FTI. Summaries of FTI's communications with Defendants' representatives were subsequently provided by Mr. Pace and Mr. Harrison. *Defendants' Reply Brief (#456, #457), Exhibit "A"*.

On July 2, 2009, FTI consultant Mike Pace informed Defendants' counsel that FTI was able to resolve the issue with respect to the Greenwich, Connecticut server and it no longer needs to re-image a portion of the server. Defendants have accordingly withdrawn that portion of their *Motion (#451)* that requested that the server be made available for re-imaging. *See Notice of Withdrawal (#465)*, filed on July 15, 2009. At the July 31st hearing, Defendants' counsel also advised the Court that following the initial status hearing on July 2, 2009, Defendants directed FTI to suspend its forensic investigation pending the Court's decision on the pending motions.

**DISCUSSION**

Defendants' Emergency Motion (#451) requests that the Court order Plaintiffs (1) to answer "FTI's question about whether data from the New Laptop was copied to other devices"; (2) that Plaintiffs' counsel be required to participate in all communications with FTI going forward "so that they are no longer able to manufacture attacks on FTI's independence" or that the Court adopt some other process to govern the parties' communications with FTI pending the completion of its forensic assignment; (3) that Plaintiffs be required to respond to six interrogatories and a document request "relating to the newly raised issue of 'possible water damage' to the missing New Laptop"; and (4) that Plaintiffs be ordered to reimburse Defendants for the fees and costs incurred in bringing its motion. *Motion (#451)*, pages 18-21.

Plaintiffs argue in their Response and Countermotion (#452) that Defendants have engaged in improper unilateral and "secret" communications with FTI Consulting, Inc. Accordingly, Plaintiffs request that the Court (1) vacate the May 14, 2009 forensic examination order; (2) require that all computer materials obtained from Gordon by FTI be returned to Gordon; (3) that FTI be disqualified from appearing further in this matter; and (4) that the Court modify its March 9, 2009 order and deny

10

Defendants' Spoliation Motion with prejudice. *Response/Countermotion (#452),* page 3.

The Court's verbal and written orders in this case do not expressly set forth the legal authority under which FTI was appointed as an independent expert. The district court has the inherent power to appoint an expert as a technical advisor to the court. *Reilly v. United States*, 863 F.2d 149, 155 n. 4 (1st Cir. 1988). No specific rules govern the appointment of such expert advisors. The court's appointment of an independent expert *witness*, however, is governed by Rule 706 of the Federal Rules of Evidence. "A court appointed expert is a witness subject to Rule 706 if the expert is called to testify or the court relies on the expert as an independent source of evidence." *Federal Trade Comm'n v. Enforma Natural Products, Inc.*, 362 F.3d 1204, 1213 (9th Cir. 2004), *citing Association of Mexican-American Educators v. State of California*, 231 F.3d 572, 591 (9th Cir. 2000) and *Reilly v. United States*, 863 F.2d at 156-57. Rule 706(a) provides as follows:

> The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses upon its own selection. An expert witness shall not be appointed by the court unless the witness agrees to act. A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have the opportunity to participate. A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party, including a party calling the witness.

One of the principal reasons for the court to appoint an expert witness is to obtain impartial testimony to aid the court or the jury in resolving a scientific issue. *Monolithic Power Systems, Inc. v. O2 Micro International Ltd.*, 558 F.3d 1341, 1347 (Fed. Cir. 2009), citing McCormick on Evidence § 8 (4th Ed. 1992). Under Ninth Circuit law, district courts enjoy wide latitude in regard to the appointment of experts under Rule 706. *Monolithic,* 558 F.3d at 1348, citing *Walker v. American Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999).

FTI and its personnel are clearly independent *expert witnesses* within the meaning of Rule 706. Judge Ezra concluded that an independent expert should be appointed to search Plaintiffs' computer hard drives for potentially relevant emails that may have been "deleted" from the computer programs, but which may still exist on the computer hard drives and can be discovered and retrieved through

forensic examination. The forensic expert is also required to determine and report whether emails during the Relevant Period were deleted and whether such deletion occurred under circumstances evincing any effort to destroy or conceal evidence. *Order (#449)*. The order therefore anticipates that the forensic examination may develop new evidence and that FTI will be called upon to testify about its examination findings as they relate to the spoliation of evidence issue.

As is evident from Judge Ezra's statements during the February 23rd hearing, the forensic expert needed to be independent because the expert would be required to provide any potentially relevant emails discovered during the examinations to Plaintiffs' counsel for purposes of making objections and to then provide the emails to the Court for *in camera* review. Only after the Court reviewed the emails and any objections to their production would they be provided to Defendants. It is also clear the Judge Ezra intended that the forensic examination be performed in an impartial manner because the Court or jury is likely to rely on the expert's findings in regard to its efforts to locate and restore any additional relevant emails and/or whether the forensic examination discloses evidence of willful or intentional document destruction or concealment.

Rule 706(a) provides that the expert witness shall be informed of his or her duties by the court in writing or at a conference in which the parties shall have the opportunity to participate. Order (#449) advises FTI of its duties in this case. 29 Wright & Gold, *Federal Practice and Procedure: Evidence* § 6305 (1997) states that after the court informs the expert of his duties and the expert commences work, the court and parties should remain available to answer the expert's questions or refine his instructions where necessary. As a safeguard against bias, these communications should be conducted in a manner open to all parties. *Id., citing Leesona Corp. v. Varta Batteries, Inc.*, 522 F.Supp. 1304, 1312 n. 18 (D.C.N.Y. 1981). Ex parte communications between the judge and the expert, or between a party and the expert are discouraged. *Id., citing United States v. Green*, 544 F.2d 138, 146 (3rd Cir. 1976) (disapproving of ex parte judicial communication with the expert witness); *Leesona Corp. v. Varta Batteries, supra*, (order prohibiting parties from engaging in ex parte communications with the expert witness.). *See also Crawford v. Greater Cleveland Regional Transit Authority*, 1991 WL 328037 (N.D. Ohio) *1 (order prohibiting *ex parte* communications between court appointed expert and parties' counsel.). *Kenneth C. v. Delonda R.*, 814 N.Y.S.2d 562 (Table), 2006 WL 47429 (N.Y.Fam.Ct. 2006)

*8, suggests that it is the practice in federal courts to prohibit *ex parte* communications between the court appointed expert witness and the parties' counsel.

Order (#449), however, does not contain any express provision that prohibits the parties or their counsel from engaging in *ex parte* communication with FTI Consulting during the course of its investigation. It is also clear that Plaintiffs impliedly acquiesced to Defendants' counsel engaging in at least some *ex parte* or unilateral communications with FTI up through June 3, 2009. Plaintiffs' counsel were obviously aware that Defendants' counsel were coordinating the scheduling of the examination of Plaintiffs' computers by FTI's personnel and must therefore be communicating with FTI for that purpose. Arguably, Plaintiffs' counsel should also have known that Defendants' counsel would provide information or documents to FTI that it would need to carry out its assignment, such as the search protocol which FTI would use in order to search the retrieved data for emails and documents relevant to this litigation. *See Order (#449)*, ¶ 5. There is no evidence that Plaintiffs' counsel objected to Defendants engaging in any *ex parte* or unilateral communications with FTI prior to June 3, 2009.

Although order (#449) did not explicitly prohibit *ex parte* communications with the independent expert, this is not the end of the Court's analysis. Defendants' attorneys were obviously aware of the Court's repeated statements during the February 23, 2009 hearing that the forensic experts would need to be independent. Defendants' counsel acknowledged this requirement at the hearing and in the emergency motion they filed on April 24, 2009. *Motion (#441)*, page 15. The Court must determine whether Defendants' counsels' unilateral communications and dealings with FTI went beyond reasonable communications to commence and coordinate the forensic examination, and were of such an extent as to compromise FTI's independence and impartiality.

The Court finds that it was reasonable for Defendants' counsel to contact FTI Consulting prior to entry of order (#449) to determine if FTI was willing to serve as the independent forensic expert. From the email exchanges between FTI and Defendants' counsel, however, it appears that these initial communications involved two of Defendants' "outside" defense attorneys, George Garvey and Mike Lorenzini, as well as Simon's assistant general counsel Jack Boyd. *Motion (#451), Exhibit "O"*, pages 5-6. The Court fails to see why it was reasonable or necessary for three of Defendants' attorneys, including an in-house counsel, to participate in the initial contacts with FTI, especially when Plaintiffs'

1  attorneys were not notified or invited to participate in the discussions.

2  It appears that following their initial discussion(s) with Defendants' counsel that FTI's
3  personnel reviewed Defendants' Spoliation Motion through PACER.  Defendants' counsel then
4  provided other case documents to FTI without notifying Plaintiffs' counsel or seeking their consent.
5  Defendants' counsel provided FTI with Plaintiffs' opposition to the Spoliation Motion and Defendants'
6  reply brief, as well as the declarations and exhibits "in support of the spoliation sanction motion."
7  *Motion (#451), Exhibit "O"*, page 20.  Defendants' counsel did not, however, provide FTI with the
8  exhibits to Plaintiffs' opposition.  At the July 31st hearing on this motion, Defendants' counsel stated
9  that the failure to provide FTI with Plaintiffs' exhibits was inadvertent or a mistake.  Defendants'
10 counsel also suggested that the exhibits were unimportant since FTI had both sides' motion  briefs.
11 This, of course, begs the question why Defendants' counsel thought it useful to provide FTI with the
12 exhibits to their motion.

13 The Court cannot say that FTI's impartiality as the forensic expert was destroyed by reading the
14 parties' respective briefs on the Spoliation Motion or Defendants' exhibits in support of that motion.  It
15 is also conceivable that the documents that Defendants' counsel provided contain some useful
16 background information for the forensic examination.  What the Court finds unacceptable, however, is
17 that Defendants provided these documents to FTI and answered various questions that FTI posed to
18 Defendants' counsel, *Motion (#451), Rutten Affidavit*, ¶ 8, without any consideration to whether these
19 matters should first be discussed with Plaintiffs' counsel and/or whether Plaintiffs should be afforded
20 the opportunity to object or participate in the disclosures to the independent forensic expert.

21 On May 14, 2009, Defendants' counsel, Mr. Rutten, emailed a copy of order (#449) to FTI
22 stating that the order "defines the parameters of the forensic examination and the activities to be
23 conducted in connection therewith."  *Id., Exhibit "O"*, page 42.  In response, Mr. Pace of FTI advised
24 Defendants' counsel that FTI would shortly provide an "engagement document."  Mr. Pace further
25 stated: Our current thinking is to consider having both sides ... sign the engagement letter, *in part*
26 *because the order is entered pursuant to the joint agreement by the parties, and requires us to submit a*
27 *report to all parties.*"  *Id.,*  at page 43.  (Emphasis added by the Court.).
28 . . .

Mr. Rutten's almost immediate response to Mr. Pace's statement was "Let's have Simon as the engaging party since it's the only one paying the bills." *Id.* The fact that Defendants were responsible for payment of FTI's services, however, does not alter FTI's status as an independent expert, appointed by the Court. The engagement letter that FTI and Defendants subsequently executed on or about May 21, 2009 contained provisions that went beyond Defendants' mere obligation to pay FTI's fees. Although the Court's concern regarding the unilateral nature of this agreement are ameliorated somewhat by the fact that the agreement incorporates the May 14, 2009 order, the agreement created a contractual relationship *solely* between Defendants and FTI. Defendants' counsel did not have the unilateral right to make this contractual decision. Even without FTI's suggestion that both parties sign the engagement agreement, Defendants' counsel should have asked Plaintiffs' counsel whether they desired to be a party to the engagement agreement. It would also have been advisable to submit the engagement agreement to the Court for its approval.

Most disturbing to the Court is Defendants' counsels' decision to invite FTI's personnel to attend an in-person meeting with Defendants' counsel at Simon's offices in Indianapolis, Indiana on May 19, 2009. This was again done without notifying Plaintiffs' counsel of the meeting or, obviously, inviting them to participate. In addition to Mr. Rutten, Defendants' assistant general counsel, Jack Boyd, was present at this meeting. Mr. Rutten defends this meeting in his affidavit as follow:

> The forensic examinations are important to Simon, and Simon is the only one paying FTI's bills, subject to a provision in the Court's Order permitting Simon to shift those costs to Plaintiffs upon an appropriate showing. Although Simon had confidence in the abilities of FTI as an entity, Simon took steps to ensure that the particular FTI personnel who were expected to be involved would be sufficiently knowledgeable and experienced. On May 12, 2009, Simon asked for curricula vitae for the primary personnel who were expected to be involved and it received them the following day. On May 19, 2009, Simon interviewed three of those personnel in person prior to retaining FTI.

*Motion (#451), Rutten Affidavit*, ¶ 9.

The foregoing statement would be appropriate if Defendants' counsel was describing his dealings with an expert that Defendants were considering retaining pursuant to Fed.R.Civ.Pro. 26(b)(2). Defendants' counsel's statements, however, are not appropriate in regard to an independent expert who had already been approved by the Court. The forensic examinations are as important to Plaintiffs as

they are to the Defendants.  Plaintiffs have an equal interest in the qualifications of the FTI personnel who will perform the forensic examinations and upon whose testimony the court or jury may ultimately rely in deciding whether Plaintiffs destroyed or concealed relevant evidence.  Even as to the expert fees that Defendants are obligated to pay, Plaintiffs have an interest that FTI's ability to perform the forensic examination is not compromised by cost limitations that Defendants might impose on FTI's services.  There is also the possibility that such fees may later be imposed on Plaintiffs.  *Order (#449)*, ¶ (7).  Plaintiffs' counsel had the right to participate in such discussions and should have been afforded the opportunity to do so.

Nor is the Court persuaded of the legitimate need for Defendants' counsel to meet with FTI's personnel at Defendants' corporate headquarters in Indianapolis.  Defendants had already represented to the Court on April 24th that FTI Consulting is "a nationally renowned expert in this area."  FTI provided Defendants' counsel with the curricula vitae for Mr. Pace, Mr. Harrison and Mr. Matrejek on May 13, 2009.  *Motion (#451), Exhibit "O"*, pages 24-41.  Those documents appear to establish each consultant's qualifications, knowledge and experience without the necessity for Mr. Rutten and Mr. Boyd to meet them in person to assess their qualifications or competency.  The meeting with FTI's personnel, by its nature, was fraught with the potential that Defendants' counsel would engage in discussions with FTI's personnel about the merits of the spoliation claim or how the examination would be conducted that could compromise its impartiality.  Even if the Court assumes that Defendants' counsel and FTI's personnel scrupulously avoided any discussion about the merits of Defendants' spoliation claim or the details of the forensic examination, the meeting by its nature contributes to the impression that Defendants' were asserting or attempting to assert unilateral influence and control over FTI.  Clearly, no such meeting should have taken place without Plaintiffs' prior knowledge and consent, and, if objection was made, Court authorization.

Finally, the Court finds that it was improper for Defendants' counsel to involve FTI's consultants in their attempt to obtain information from Plaintiffs as to "whether data from the 'possibly water damaged' laptop was copied onto other computers used by Scott Gordon."  Defendants' counsel argue that it is within the scope of FTI's forensic investigation to seek such information.  The Court disagrees.  FTI's assignment in this case is to perform a technical forensic examination of the computer

hard drives which may contain Scott Gordon's emails and to retrieve those emails. FTI is also charged with determining, based on its forensic examination of the computers, "whether emails from the Relevant Period have been deleted, and if so, when they were deleted; how they were deleted ...; who deleted them; whether they were deleted piecemeal, en masse, or in some combination thereof; and whether any of the data can be restored." *Order (#449)*. Presumably, if data from Scott Gordon's possibly water damaged laptop computer was transferred to one of the computers that FTI will be examining, then FTI may find evidence of that data during the forensic examination. That, however, is the extent of FTI's assignment. The order does not authorize FTI to conduct an investigation or interview the parties or other witnesses in order to gather evidence or information that may be relevant to the spoliation issue.

Judge Ezra's statements during the February 23, 2009 hearing, as well as in his written order (#437) entered on March 9, 2009, demonstrate Judge Ezra's belief there is a potentially significant issue of spoliation based on Plaintiffs' failure to produce relevant emails of Scott Gordon. This Court is therefore reluctant to order or recommend that the independent forensic examination that Judge Ezra authorized on February 23, 2009 be revoked. The Court, however, cannot ignore Defendants' counsels' misconduct in dealing with the court-appointed forensic expert. It was clearly the Court's intention that the forensic examination be *independent* and that obviously means that it be conducted in an *impartial* manner. The totality of the circumstances demonstrate that Defendants' counsel dealt with FTI as if it was Defendants' owned retained expert whose conduct they control, rather than an independent court-appointed expert subject to the provisions of Rule 706(a). By their conduct, Defendants' counsel have compromised FTI's appearance of independence and have thereby diminished the assurance that the forensic examination will be performed in an impartial manner.[2]

---

[2]During the July 31st hearing on the motions, Defendants' counsel cited the statement made by Plaintiffs' counsel, Mr. Weil, during the July 2nd status hearing that Plaintiffs are not claiming that FTI is corrupt. Defendants argued that this is a concession that the FTI's impartiality has not been impaired. Mr. Weil's actual statement, however was as follows:

(continued to next page)

Arguably, if this case was still in the discovery period, the Court might allow FTI to proceed with its forensic examination and permit each party to retain its own forensic expert who could, at minimum, evaluate and criticize FTI's findings and conclusions. Alternatively, the Court might disqualify FTI and permit another independent expert to be appointed in its stead. The appointment of an independent expert in this case, however, arose after discovery had ended. It is clear that the District Judge intended that the independent forensic examination would be the only additional evidence to be obtained on the spoliation issue and that it was anticipated that the Court would rely on the findings of the independent forensic expert.

Because Defendants' counsel have acted improperly and have compromised the forensic expert's impartiality, Defendants have forfeited the opportunity to obtain an independent forensic examination. To permit the forensic examination to go forward either through FTI, whose impartiality is now impaired, or through the appointment of another independent expert would be unjustified. Although this may unfortunately result in the loss of relevant evidence, i.e., the missing emails, Defendants and their counsel have only themselves to blame. In this respect, the Court rejects any assertion by Defendants that Plaintiffs' alleged previous delay or stonewalling justified their conduct *vis a vis* the independent expert.

---

> So, in many respects, much of our application is based on admitted conduct that was not contemplated by the Court and never permitted by the Court. And which was -- and the treatment of FTI akin to the way one would treat your privately retained expert.
>
> So in that respect, that, we maintain is conduct that is not in dispute. If we want to go beyond that into the question of when we were not -- I mean we're not claiming here initially that FTI is corrupt. What we are claiming is that the independent relationship that was anticipated by the Court and the strict order that the Court put in place corrupted the relationship that the Court intended.

*Transcript (#464), July 2, 2009 status hearing,* page 8.

For the reasons set forth in the body of these Findings & Recommendations, the Court agrees with the gist of Mr. Weil's full statement.

Even if Defendants had not forfeited their right to obtain an independent forensic examination, the Court would deny Defendants' request that Plaintiffs be required to answer most of their proposed interrogatories about the 2003 laptop computer or its "progeny." *See Motion (#451), Exhibit "R."* Although Mr. Pocker's May 29, 2009 letters appears to indicate that Plaintiffs have no information about the current whereabouts of the 2003 laptop or other computers to which its data was transferred, the Court probably would require Plaintiffs to provide additional information, if they have any, which may reasonably lead to the discovery of the present location of the 2003 laptop computer or of any computer to which its data may have been transferred. Because the Court concludes that Defendants are no longer entitled to a forensic examination of Plaintiffs' computers, however, this request should also be denied.

## CONCLUSION

Based on the foregoing, this Court concludes that the May 14, 2009 order regarding the forensic examination, as well as the District Court's previous verbal and written orders authorizing the independent forensic examination requested by Defendants, should be revoked. Because this requires the reversal or revocation of the District Judge's previous orders, the undersigned Magistrate Judge respectfully submits them as recommendations to the District Judge. Accordingly,

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendants' Second <u>Emergency</u> Motion to Enforce Orders Regarding Forensic Examinations and Related Relief (#451) be **denied.**

**IT IS RECOMMENDED** that Plaintiffs' Counter-Motion to Vacate Court's May 14, 2009 Order, Modify Court's March 9, 2009 Order, and Related Relief (#452, #453) be **granted** as follows:

(1) That the May 14, 2009 order and the Court's previous verbal and written orders authorizing an independent forensic examination of Plaintiffs' computers be revoked; and

(2) That all computer materials obtained from Plaintiffs by FTI be returned to Plaintiffs.

If the foregoing Recommendations are adopted by the District Judge, then it would appear that no further basis exists for Defendants to file another "spoliation motion." This Court, however, leaves

. . .

. . .

it to the District Judge to decide whether its March 9, 2009 Order (#437) should be modified to now deny Defendants's Spoliation Motion with prejudice.

DATED this 11th day of August, 2009.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge